# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DARLENE ANNE GARDNER, and B.G., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>KOOTENAI COUNTY, KOOTENAI COUNTY SHERIFF'S DEPARTMENT, KOOTENAI COUNTY SHERIFF ROCKY WATSON, KOOTENAI COUNTY SHERIFF'S DEPARTMENT ANIMAL CONTROL DIVISION, DEPUTY K. WILLIAMS, DEPUTY T. LEEDER, CRT A. SCHROEDER, DEPUTY W. CRAWFORD, SGT. CARRINGTON, DEPUTY LAUP and DOES 1-100,<br><br>Defendants. | CASE NO. CIV 08-472-BLW<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |

On November 6, 2008, Plaintiffs filed their Complaint in this case, seeking damages pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988 for alleged violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments. Plaintiffs claim damages for violation of their rights, personal injury, loss of property (including a large number of animals), defamation, and emotional distress. Before the Court are the parties cross motions for summary judgment, in which Defendants raise qualified immunity as a defense.

/ / /

/ / /

05-354

I.    **Background**

The claims here arise from county authorities' visit to Plaintiffs' home, a double-wide trailer[1] on a 1.5-acre lot in rural Kootenai County. The following facts, except where noted, are undisputed. Plaintiffs are mother and daughter. Plaintiff Brittany Gardner was sixteen years old when the events complained of occurred, and was still a minor when the Complaint was filed, but reached age 18 during the pendency of this action.

Plaintiffs say Defendants over the past ten years brought animals to them that were in need of care, and have used their property as an animal sanctuary. On August 27, 2007, an sheriff's deputy responded to a report of possible animal neglect. The officer saw a horse living in poor conditions in a corral or fenced pasture, with no water and little or no food. The pasture is located behind Plaintiffs' home, but is visible from the road. The officer approached the fence and offered the horse a treat. When the animal approached, the officer saw it was unusually thin and bony, and unable to chew its food. The officer returned and reported the horse was in poor condition and the house on the property was "a dump."

Three days later, on August 30, 2007, Kootenai County sheriff's deputies and animal control officers (collectively, the "Officers") came to the property. They observed the horse and verified the earlier report of its condition, then went to the house to talk to the property owners. They passed through a locked gate with "No Trespassing" signs, which they say they did not notice. The borders of the property were also marked with "No Trespassing" signs. As they approached the house, the Officers said they could see it was poorly maintained and they noticed strong, foul odors. They heard dogs barking inside, and a voice telling the dogs to be quiet. They could see into the mud room through the screen door. Brittany Gardner answered the door. From where they stood, the Officers observed the house was in an unsanitary condition, with what appeared to be feces covering the floor. Brittany's bare feet and clothes were dirty, and she appeared to have a rash on her upper body. The Officers describe the smell in the trailer as "nauseating" and said it caused their eyes to smart. They saw six or seven dogs inside. The Officers asked to enter, but Brittany said they should wait until her

---

[1] Because a double-wide consists of two mobile homes fastened together, there is no indication it could have been driven away or easily moved. The pleadings speak of it as Plaintiffs' permanent home.

mother returned. She told them she was sixteen years old, and home alone, and that several more dogs were locked in a bedroom because they would bite.

The Officers told Brittany that Protective Services could have her removed from her home for her own safety. They entered the home without permission by pushing the screen door until the latch gave way. The trailer was filthy and malodorous, with no running water, dirty dishes filling the sink, and evidence of large numbers of flies. Two refrigerators, which had been inoperative for over a month each, were filled with moldy and spoiled food. Hearing noises coming from one of the rooms, the officers looked inside the bedrooms, and found two adult white-tailed deer living in different rooms, along with a number of domestic animals. The deer and some of the other animals appeared to be in very poor health.

When Darlene Gardner returned, the Officers told her they would not permit her to bring Brittany back to the house, as it was unfit to live in. They also threatened to have Brittany taken from her custody if she tried to take the child back into the trailer. The Officers then arrested Mrs. Garner for animal neglect. The animals were seized and removed. A few were eventually adopted, but most died or were euthanized. Darlene Gardner was permitted to take her daughter with her to a women's shelter. Darlene Gardner's husband (Brittany's father) pleaded guilty to charges of animal neglect. No charges were pursued against Darlene Gardner. At no time during this process did the Officers obtain a warrant.

## II. Legal Standards

### A. Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). The

///

moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The mere fact that the parties filed cross-motions "does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975). "[Each motion must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). When proper grounds for granting summary judgment have not been established, "[s]ummary adjudication may be appropriate on clearly defined, distinct issues." *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1029 (E.D. Cal. 2002), citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990).

Civil rights complaints are construed liberally. *See Holley v. Crank*, 400 F.3d 667, 674 (9th Cir. 2005) (citation omitted). Liberal construction does not, however, exempt them from applicable rules and legal standards.

### B.     Qualified Immunity

Qualified immunity shields officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal citations omitted). "The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [his or her actions] to be lawful, in light of clearly established law and the information" the official possessed. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Qualified immunity is "an immunity from suit rather than a mere defense of liability . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the Supreme Court has "repeatedly . . . . stressed the importance of resolving [qualified] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)

"[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."

*County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Deciding the constitutional issue first is not mandatory, however. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

Assuming a constitutional right would have been violated if Plaintiffs' allegations are established, Plaintiffs bear the burden of proving the rights they claim were clearly established at the time of the alleged violation. *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

Plaintiffs did not respond to Defendants' qualified immunity argument, but because Defendants bear the burden of proof on this issue, *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) (citing *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004)), the Court will consider whether they have met their burden. For reasons set forth in the Fourth Amendment discussion below, the Court denies Defendants' motion for summary judgment on qualified immunity grounds as to Fourth Amendment claims for entry into Plaintiffs' house.

### III. Discussion

#### A. Capacity to Sue

In her affidavit in support of Plaintiffs' motion for summary judgment, Darlene Gardner requested permission to represent Brittany as her next friend until Brittany reached age 18. Defendants have also raised Brittany's capacity to sue as a defense. Brittany does not need a guardian ad litem at this point because she is now 18 years old. Darlene Gardner's request to represent her is denied as moot.

#### B. Eighth Amendment Rights

Plaintiffs assert claims for violation of their Eighth Amendment rights, but it is apparent they cannot proceed under this theory. They conceded as much as oral argument. The Eighth Amendment prohibits excessive bail, excessive fines, and cruel and unusual punishments. No bail or fines are at issue here, so Plaintiffs claims must be that Defendants' treatment of them amounted to cruel and unusual punishment. The Officers did not enter Plaintiffs' property or trailer to punish them; rather,

they were investing suspected crimes. Therefore, the rights at issue in this case relate to the allegedly unreasonable search of the Plaintiffs' property and home and must be analyzed under the Fourth Amendment. Plaintiffs' Eighth Amendment claims are dismissed.

### C. Substantive Due Process

Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (citations and quotation marks omitted).

Plaintiffs are apparently relying on substantive due process rights to support their claims for an allegedly unreasonable search and seizure, for sending Plaintiffs to live in a homeless shelter, for the deaths of the animals, and for all the ill effects Plaintiffs suffered as a result of their experiences generally. (Pls.' Mot. for Summ. J. ("Pls.' MSJ"), 12.) As with the Eighth Amendment claims, the Court believes most of these are properly analyzed under the Fourth Amendment. *See Graham*, 490 U.S. at 388 (explaining that claim for unreasonable seizure of a person was properly analyzed under the Fourth Amendment's "objective reasonableness" standard rather than under a substantive due process standard).

Plaintiffs have provided no evidence showing Defendants wrongly caused the animals' deaths; rather, uncontroverted evidence shows Darlene Gardner and her husband consented to forfeiture of the animals. (Ds.' Mot. for Summ. J. ("Defs.' MSJ"), Exs. 4 (transcript of hearing), 5 (signed consent by Mr. Gardner).) Furthermore, Defendants did not cause the animals' poor health.

There is likewise no evidence showing both Plaintiffs were required to leave their home, only that officers would not permit Darlene Gardner to take Brittany back to the family home in its unsanitary condition. There is no showing Defendants were responsible for the condition of Plaintiffs' home, or that they were required to permit Darlene Gardner to have her daughter live in unsanitary conditions. Although Plaintiffs argue Darlene Gardner suffered emotional harm because she lived in the shelter, they provide no evidence showing Defendants were responsible for conditions in the shelter.

///

The loss of one's home, without more, does not implicate a substantive due process right. *Anderson v. Smith*, 2009 WL 2139311 (E.D.Cal., July 10, 2009) (holding that depriving plaintiffs of the right to live in their dangerously unsanitary home did not amount to a violation of substantive due process) (citing, *inter alia*, *Lindsey v. Normet*, 405 U.S. 56 (1972)). Nor does preventing Darlene Gardner from bringing Brittany back into the home in its filthy condition shock the conscience. The Court dismisses the substantive due process claims.

### D.     Procedural Due Process

These claims apparently refer to the Officers' actions in seizing the animals without giving Plaintiffs a hearing in advance. It may refer to other actions as well, but this is unclear. Plaintiffs did not respond to this part of Defendants' motion for summary judgment.

Plaintiffs have not shown they were entitled to a hearing or any other particular procedural protections before the animals were seized. Idaho has a post-deprivation remedy for property deprivations by the state in the Idaho Tort Claims Act, Idaho Code §§ 6-901 *et seq.*, and Plaintiffs have not shown it is inadequate. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (holding that intentional deprivations of property by the government do not violate due process, provided adequate state post-deprivation remedies are available). Furthermore, undisputed evidence demonstrates Darlene Gardner and her husband had the benefit of a post-deprivation hearing, and at that hearing consented to forfeiture of the animals.

If Plaintiffs intended their procedural due process claim to cover any other actions, the Complaint does not make this clear, and their briefing adds nothing further. These claims are dismissed.

### E.     Equal Protection

The Complaint does not make any allegations that could reasonably be understood as supporting an equal protection claim, and Plaintiffs have not responded to Defendants' MSJ regarding their equal protection claims. These claims are accordingly dismissed.

/ / /

/ / /

/ / /

### F. Claims Against Political Entities

In addition to individual Defendants, Plaintiffs have named Kootenai County, the Kootenai County Sheriff's Department, and the Animal Control Division of the Kootenai County Sheriff's Department (collectively, the "County Defendants").

The Complaint makes no allegations against the County Defendants that would state a claim for conspiracy to violate civil rights under 42 U.S.C. § 1985. Therefore Plaintiffs cannot pursue claims against these Defendants under § 1986 either. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) (holding that plaintiffs can only state a claim under § 1986 if they have also stated a claim under § 1985).

Likewise, while Plaintiffs have attempted to state a § 1983 claim against the County Defendants pursuant to *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690–94 (1978), they fail to allege any policy, practice, or custom that led to any violation of their rights. Nor is there respondeat superior liability under § 1983. *Monell* at 691. Finally, no provision of § 1988 supports any claim by Plaintiffs against the County Defendants.

For all these reasons, Plaintiffs' claims against the political entities are dismissed.

### G. Fourth Amendment Search and Seizure

What is left of substance are only Plaintiffs' Fourth Amendment claims against the Officers for the events of August 30, 2009. The only evidence Plaintiffs have presented is a declaration by Darlene Gardner.

The Fourth Amendment prohibits unreasonable searches and seizures, and, subject to some exceptions, warrantless searches are generally *per se* unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967). "The Fourth Amendment is not triggered unless the state conducts a search or seizure in an area in which there is a constitutionally protected reasonable expectation of privacy." *Friedman v. Boucher*, 568 F.3d 1119, 1133 (9th Cir. 2009) (quoting *United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir. 1996)) (further citation and internal quotation marks omitted).

Defendants argue that their act of observing the horse in the pasture on August 27 and 30, 2007 was not a Fourth Amendment violation, under the "open fields" doctrine set forth in *Hester v. United States*, 265 U.S. 57, 59 (1924) and *Oliver v. United States*, 466 U.S. 170, 173 (1984). The Court

agrees. In *Oliver*, the Supreme Court held that individuals "may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178. The Supreme Court went on to explain that

> open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be.

*Id.* at 179. The Officers' observation of the horse on the lot falls within this rationale. A fenced area where a horse is kept is not a setting for "intimate activities that the [Fourth] Amendment is intended to shelter . . . ." In addition, the keeping of livestock is like the cultivation of crops; there is no societal interest in protecting the privacy of this activity.

Although Darlene Gardner's affidavit shows the property was marked with "No Trespassing" signs, "[i]t is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas." 466 U.S. at 179. Furthermore, uncontroverted evidence shows the officers could and did view from the main public road the area where the horse was kept. No evidence supports Plaintiffs' claim they had a "legitimate expectation of privacy" in that portion of their lot where the horse was kept.

Uncontroverted evidence shows the Officers' purpose going to the Gardner property was to check on the welfare of the horse, which was being neglected. Its ribs, hip bones, and tail head were clearly visible; it had trouble chewing food it was offered; and it had little food and no water. (Dec. of Timothy Leeder in Supp. of Defs.' MSJ, ¶¶ 7, 9 (Docket no. 29-5); Decl. of Karen Williams in Supp. of Defs.' MSJ, ¶¶ 4–8, 14, 17–18 (Docket no. 29-6).) The Officers were therefore justified in approaching the house on August 30, 2007 to inquire about the horse's welfare, and no warrant was required. *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants.") (citing *Davis v. United States*, 327 F.2d 301 (9th Cir. 1964), *United States v. Hersh*, 464 F.2d 228, 230 (9th Cir. 1972), *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir. 1993)).

Uncontroverted evidence also shows that as they approached the house, their observations gave them additional reasons to be concerned for the welfare of its human and animal occupants. About

100 feet from the house, they began to smell ammonia, and at closer range, feces. (Williams Decl., ¶¶ 19–20; Leeder Decl., ¶¶ 10–11.) The odor become overpowering as they climbed the steps to the front door, and as they stood outside the door they could hear dogs barking inside and see unsanitary conditions inside the mud room, through the screen door. (Williams Decl., ¶ 21; Leeder Decl., ¶¶ 11–12.) While this evidence shows the Officers might have had new matters to ask questions about, there is no evidence their stated purpose in approaching the house was motivated by anything but the "honest intent of asking questions of the occupant thereof . . ." *Davis*, 327 F.2d at 303, whether about the welfare of the horse or about things they observed as they approached.

While the Officers' entry onto Plaintiffs' property was justified under the open fields doctrine, their unconsented-to entry into Plaintiffs' home is another matter. Generally, law enforcement officers must have a search warrant to enter a residence to search. A warrantless search of a residence is permissible only if there is probable cause to search, and exigent circumstances justify the search. *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001). Defendants argue their entry into the house and bedrooms was justified under this exception, or at the very least they are entitled to qualified immunity. They point out that under Idaho Code § 25-3511, animal cruelty or neglect is a misdemeanor, and argue they had probable cause to believe the dogs were being treated cruelly.

Although there was ample evidence Brittany was living in filth and squalor and was suffering at least minor health problems, there is no evidence she was in any immediate danger. More particularly, there is no evidence Brittany was unable to take care of herself for a few hours while the officers obtained a search warrant. Given that Brittany had obviously been living in the squalid conditions for some substantial period of time, the Court cannot say as a matter of law the officers' generalized concern for her welfare constituted an exigent circumstance.

Was there any other exigency justifying the warrantless search? In view of the conditions the Officers were able to observe and the information they had, there was probable cause to believe the dogs inside were being neglected. *See, e.g., Jackson v. Silicon Valley Animal Control Authority*, 2008 WL 4544455, slip op. at 4 (N.D.Cal., Oct. 2, 2008) (officers' observation of bleeding dog and dog with broken jaw outside trailer constituted reasonable grounds for believing the trailer's owners might be keeping other animals without proper care inside.) In *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984),

the Supreme Court explained that the gravity of the underlying offense is a factor to be considered when determining whether any exigency exists. Here, the Officers suspected a misdemeanor was taking place in the house, and that it was ongoing. But there was no reason to believe the evidence of neglect would be hidden or destroyed before the Officers could obtain a warrant. And in any event, the Officers could have taken steps to prevent that.

Solicitude for the welfare of animals has been found to constitute an exigent circumstance. Defendants cite *Tuck v. United States*, 477 F. Supp. 2d 1115, 1120 (D.C. 1984) and a number of state opinions relying on *Tuck* for this proposition. Several recent cases from courts within this District also hold that preventing animals from suffering constitutes exigent circumstances to the same degree as preventing human suffering would. *Jackson*, 2008 WL 4544455, at 8, *Anderson v. Smith*, 2009 WL 2139311, slip op. at 16 (E.D.Cal., July 10, 2009). In these cases, however, the animals were known or reasonably believed to be suffering. In *Tuck*, for instance, a number of animals were visible in a hot, unventilated display case, and police rescued only two that seemed to be suffering directly. 477 A.2d at 117. Defendants have identified no case where officers' suspicion that animals were living in unsanitary conditions, without information suggesting they were suffering, was held to constitute exigent circumstances justifying a warrantless entry of a home. The *Anderson* court's analysis supports this:

> Here, the officers arrived at the scene having received numerous, prior public complaints and reports of foul odors and barking at the residence. Upon arriving at the residence on October 26, 2009, they could smell feces and urine from outside the front gate, and Officer Smith observed violations of the building code in plain view in the garage once Ms. Anderson came outside through it. These observations alone might not have justified entry. However, once Ms. Anderson began bringing the puppies outside, the situation changed. The dogs were in horrible physical condition, stank of urine, and were visibly ill. Even after all of the puppies had been removed from the house, Officer Smith could tell there were many more animals remaining inside. Both officers noticed that a terrible smell was coming from inside the house.

2009 WL 2139311, at 16.

To be sure, the Officers in this case had some reason to believe the dogs inside the house were being neglected and confined inhumanely. Also, the dogs were actively barking, possibly suggesting they were unhappy, but also confirming they were responsive. While a jury might determine the Officers reasonably believed the delay occasioned by getting a warrant or waiting for Darlene

/ / /

Gardner's return would endanger the dogs or prolong their suffering, the Court cannot do so as a matter of law.

The Court concludes that Defendants have not met their burden of establishing the defense of qualified immunity. The evidence might support a finding that neither Brittany nor the dogs were in any immediate danger, and that the Officers therefore were not compelled by exigent circumstances to enter and search the house without a warrant.

### H. Damages

Although Plaintiffs have alleged a number of possible types of damages and violations for which damages might be awarded, it is clear they cannot recover for most of them. As discussed above, they cannot recover for any of the events before the Officers entered their house. Nor can they recover for loss of their animals, or emotional damages resulting from loss of their animals, because the animals were forfeited and in the case of the two deer they had no ownership rights at all. Idaho Code § 36-103(a) (providing that all wildlife is property of the state). Plaintiffs also cannot claim damages because they stayed in a women's shelter.

The only damages Plaintiffs might recover are those arising directly from the Officers' entry into and search of their home. These are limited to emotional harm and physical damage to the door, but quite possibly will be limited to nominal damages only; there is no evidence to support any other recovery.

### IV. Conclusion and Order

For these reasons, Plaintiffs' motion for summary judgment is **DENIED**. Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is **DENIED** with respect to the Officers' warrantless entry and search of Plaintiffs' home, but **GRANTED** in all other respects.

IT IS SO ORDERED.

DATED: 7-31-09

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge